**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| LISA LENNAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 2:20-cv-00057-GZS |
| | ) | |
| HEALTHCARE SERVICES GROUP, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Before the Court is the Motion for Summary Judgment of Defendant Healthcare Services Group, Inc. (ECF No. 28).[1]  Having reviewed the Motion and the related submissions filed by the parties (ECF Nos. 27 & 29–34), the Court DENIES the Motion.

## I.     LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' if the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party, and a fact is 'material' if it has the potential of affecting the outcome of the case."  Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

---

[1] Defendant notes that it has until now been erroneously captioned as "Healthcare Service Group, Inc."  See Mot., PageID # 433 n.1.

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (cleaned up); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Hum. Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (cleaned up). "When determining if a genuine dispute of material fact exists, [courts] look to all of the record materials on file, including the pleadings, depositions, and affidavits without evaluating the credibility of witnesses or weighing the evidence." Taite, 999 F.3d at 93 (cleaned up).

District of Maine Local Rule 56 prescribes a detailed process by which the parties are to place before the Court the "material facts . . . as to which the moving party contends there is no genuine issue." D. Me. Loc. R. 56(b). This local rule further requires each statement of material fact to be "followed by a citation to the specific page or paragraph of identified record material supporting the assertion." D. Me. Loc. R. 56(f). A party opposing a motion for summary judgment must then file an opposing statement in which it admits, denies, or qualifies the moving party's statements, with citations to supporting evidence, and in which it may set forth additional facts, again with citations to supporting evidence. D. Me. Loc. R. 56(c). Ultimately, in constructing the

narrative of undisputed facts for purposes of summary judgment, the Court deems any statement with a supporting record citation admitted but "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment."  D. Me. Loc. R. 56(f).

## II.    BACKGROUND[2]

In 2014, Plaintiff Lisa Lennan was hired by Genesis Healthcare ("Genesis") as a traveling dining services director, a role for which she traveled regularly between Genesis's various skilled nursing care facilities in the region.  (See Pl. Response SMF (ECF No. 31), PageID # 494; Def. Reply SMF (ECF No. 34), PageID # 537; Joint Stipulated Record ("JSR") (ECF No. 27), PageID # 233.)  In 2016, Lennan became the Director of Dining Services at Genesis's Springbrook Center in Westbrook, Maine ("Springbrook").  (Pl. Response SMF, PageID # 494; Def. Reply SMF, PageID # 537.)

Not long after, Defendant HealthCare Services Group, Inc. ("HCSG") took over food service operations at Genesis's facilities, including Springbrook.  (Id.)  As a result, Lennan became a HCSG employee in April 2017.  (Stip. (ECF No. 27), PageID # 106.)  As HCSG's Food Services Account Manager at Springbrook, Lennan's direct supervisor during the relevant time period was Allison Goscinski, HCSG District Manager.  (Id.)  In turn, David Chlosta, HCSG Director of Operations, was Goscinski's supervisor.  (Id.)

---

[2] The Court notes that both sides have asked the Court to strike many of their opponent's statements of material fact. See Pl. Response SMF (ECF No. 31), PageID #s 489–92; Def. Reply SMF (ECF No. 34), PageID #s 539–55.  With limited exceptions explicitly discussed herein, the Court finds it unnecessary to address each of these requests individually.  Rather, the Court has reviewed all of the cited exhibits and has disregarded any statement of fact that is not properly supported by admissible evidence in the record currently before the Court, as it is obliged to do.  See D. Me. Loc. R. 56(f).

### A.  Springbrook

Springbrook is one of Genesis's most highly populated facilities.  (Pl. Response SMF, PageID # 495; Def. Reply SMF, PageID # 538.)   During the time period relevant to this case, Rebecca Gagnon, a Genesis employee, was Springbrook's Executive Director.  (Stip., PageID # 107.)  In this role, Gagnon exercised ultimate authority over affairs at Springbrook.  (See Def. SMF (ECF No. 29), PageID # 457; Pl. Response SMF, PageID # 486; JSR, PageID #s 257, 314.) This authority included the ability to ask HCSG to remove personnel from Springbrook.  (See JSR, PageID #s 257, 314, 357.)

### 1.  Food Services at Springbrook

However, Gagnon's authority did not extend to setting the hourly labor budget for food services at Springbrook.  (Def. SMF, PageID # 456; Pl. Response SMF, PageID # 486.)  Rather, this budget was set by Genesis at a regional level.  (Id.)  Then, the responsibility fell to HCSG management to track payroll reports on a daily, weekly, and monthly basis to ensure that its food service operation at Springbrook stayed within the allotted hours.  (Id.)  During the 2018–19 time frame, the number of hours allotted shrank.  (JSR, PageID # 129.)  By October 2018, the daily labor budget for Springbrook's food service operations was 50.5 hours.  (Id.; Def. SMF, PageID # 457; Pl. Response SMF, PageID # 486.)

As reflected in multiple emails exchanged between Goscinski and Lennan between October 2018 and January 2019, Goscinski repeatedly expressed concerns that Springbrook was going over the allotted budget and needed to further rein in the hours worked by HCSG staff.  Meanwhile, Lennan felt the labor budget imposed by Genesis was "not doable" and asked for additional hours. (JSR, PageID # 129; see also id., PageID #s 131–38.)  In addition to expressing her frustration to Goscinski, Lennan was referred to Genesis and informed that only Genesis could increase the

hourly labor budget for food services at Springbrook.  (Id., PageID # 273.)  Lennan separately approached Gagnon for more hours on at least three occasions.  (Id.)

### 2. Lennan's Responsibilities at Springbrook

As HCSG's on-site manager for food services at Springbrook, Lennan was responsible for scheduling the HCSG food service staff within the just-described hourly labor budget.  She was also responsible for ensuring that her staff fed each resident at Springbrook in accordance with specific nutritional requirements.   (Pl. Response SMF, PageID # 495; Def. Reply SMF, PageID # 538; JSR, PageID # 376.)  These requirements were listed in individualized meal tickets that contained information on diet, food texture, allergy information, and any fluid restrictions. (Id.)

Beyond these responsibilities, Lennan was responsible for ensuring Springbrook's food service operation complied with state licensing requirements, including standards of cleanliness, safety, and sanitation.  (Def. SMF, PageID # 455; Pl. Response SMF, PageID # 485.)  She was also expected to follow and enforce HCSG's policies and procedures and ensure adequate performance on monthly Food Safety and Sanitation Audits.[3]  (Id.)  In order to ensure that all of her staff understood the various compliance requirements, Lennan prepared and conducted in-service trainings.  (Def. SMF, PageID # 456; Pl. Response SMF, PageID # 485.)

Lennan was also expected to counsel and discipline her staff if their job performance failed to meet any of these requirements.  (Def. SMF, PageID #s 455–56; Pl. Response SMF, PageID # 485.)  HCSG maintained a progressive disciplinary policy that instituted the following steps:  (1) verbal counseling; (2) written warning; (3) second written warning; (4) third and final warning; (5) termination.  (JSR, PageID # 314.)  In accordance with this policy, Lennan had

---

[3] Some of these HCSG audits are included in the record.  See JSR, PageID #s 169–70, 177–78, 205–10, 211–12; see also Def. SMF, PageID #s 460, 462, 466–68; Pl. Response SMF, PageID #s 488–89, 491.

authority to issue Employee Warning Notices ("EWNs") to any employee who violated HCSG's safety, health, and other rules.[4]  (Def. SMF, PageID # 455; Pl. Response SMF, PageID # 485.)

### B.  Genesis's Complaints about HCSG's Operations at Springbrook

Given the division of labor and responsibility between Genesis and HCSG, there was frequent communication regarding operational issues at Springbrook.  In 2018, Gagnon raised a variety of concerns with HCSG regarding Springbrook's food service operations and Lennan, in particular.

In October 2018, Gagnon, along with Victoria Cash, a Genesis Regional Marketing Manager, complained after Leta Petit, a HCSG dietary aide at Springbrook and one of Lennan's direct reports, refused to provide a sandwich gratis to a dying resident's family member.  (JSR, PageID #s 126, 251.)  Following Gagnon's complaint, Lennan was advised by her HCSG manager that she and her team were "not the decisionmakers" on who got served and also reminded that Genesis was HCSG's client.  (Id.)  Later that month, Gagnon complained directly to Lennan after observing people in the kitchen without hair nets, describing the problem as "a very easy infection control issue."  (Id., PageID # 128.)

In November 2018, Gagnon, following up on a pest inspection report, expressed concern to Lennan about the cleanliness of a third-floor kitchenette and the improper storage of cleaning chemicals.  (Id., PageID # 139.)  Gagnon also complained about delays in getting a dishwasher and garbage disposal back into service, which had resulted in all meals being served with disposable plates and cups.  (Id., PageID # 142.)  Lennan responded to this particular complaint via an email suggesting there was "a gross misconception of what needs to take place to get the

---

[4] HCSG's Employee Handbook states that "[d]iscipline, including suspension and discharge, may be imposed as a result of a single incident, or several incidents, as determined by your supervisor," as well as that EWNs "generally (but not always) will be used."  Def. Ex. A (ECF No. 34-1), PageID # 567.

kitchen up and running as normal." (<u>Id.</u>, PageID #s 141–42.)  Gagnon found the tone of Lennan's response "unnecessary" and forwarded it to Goscinski seeking further support.  (<u>Id.</u>; Def. SMF, PageID # 458; Pl. Response SMF, PageID # 487; JSR, PageID # 355.)  In a follow-up email exchange, Gagnon indicated to Goscinski that there were "significant issues with [Lennan] that need to be addressed." (JSR, PageID #s 143, 355.)  Separately, Goscinski informed Lennan that Gagnon also was concerned with Lennan's attendance at morning meetings.  (<u>Id.</u>, PageID # 145.)

Later in November 2018, Genesis forwarded to HCSG management a "Springbrook Center Quality Review."  (<u>Id.</u>, PageID #s 146–66.)  This review found that Springbrook had "failed to ensure that food was prepared, distributed and stored under sanitary conditions." (<u>Id.</u>, PageID # 162.)

On January 17, 2019, Gagnon expressed additional concerns to Lennan and Goscinski about the cleanliness of the kitchen, including its walls, and asked if dietary aides were regularly cleaning up spills, surfaces, and other daily items.  (<u>Id.</u>, PageID # 172.)  Lennan responded that even if the kitchen was not "spotless," her staff were "keeping it clean for the most part," and she also noted that some of the walls were permanently stained.  (<u>Id.</u>, PageID # 171.)

### C. Lennan's Reports about Operations at Springbrook

In early 2019, Lennan ended up making a series of reports to HCSG, all of which related to a series of disciplinary actions she took against Petit.  (Stip., PageID # 107.)

#### 1. Lennan's Discipline of Petit

Between January 18, 2019, and February 22, 2019, Lennan issued a total of four EWNs to Petit.  (<u>Id.</u>)  First, on January 18, 2019, while responding to a report that Petit was serving food to residents that was not in line with their individual dietary restrictions, Lennan observed Petit

struggling to identify the appropriate textures of food to serve to advanced dysphagia[5] patients on the third floor.  (JSR, PageID # 262.)  When Lennan tried to explain the proper procedure, Petit yelled at her.  (Pl. Response SMF, PageID # 497; Def. Reply SMF, PageID # 540; JSR, PageID # 262.) Lennan disengaged and returned downstairs to wait for Petit.  (Id.)  While waiting for Petit, she drafted an EWN.  (Id.; JSR, PageID # 179.)  In this EWN, Lennan briefly described her attempt to educate Petit and marked fields categorizing Petit's conduct as "[u]nsatisfactory performance or conduct" and a "[v]iolation of the company rules, policies or practices."  (JSR, PageID # 110.)  When Petit returned downstairs, Lennan attempted to meet with her to provide documented counseling as noted in the EWN.  (Id.; JSR, PageID #s 262–63.)  However, when Petit saw the EWN from the entrance of Lennan's office, she exclaimed, "I'm not signing that, I'm going to make a complaint," and walked away.  (Def. SMF, PageID # 461; Pl. Response SMF, PageID # 488.)

On February 1, 2019, Lennan issued Petit a second EWN after Petit crossed off dates on certain food items, failed to remove out-of-date items, and failed to clean up spills found in the third-floor refrigerators.  (Def. SMF, PageID # 463; Pl. Response SMF, PageID # 489; JSR, PageID #s 113, 265–66, 421.)  Next, on February 11, 2019, Lennan issued Petit another EWN when, during a meeting Lennan convened to discuss the condition of the refrigerators with Petit and another dietary aide, Petit slammed her hands down on the table and exclaimed, "I don't care Lisa, write me up."  (Def. SMF, PageID #s 465–66; Pl. Response SMF, PageID # 491; JSR, PageID # 421.)

---

[5] A patient with dysphagia (difficulty swallowing) "may cough or choke while attempting to swallow saliva, liquids, or food."  Dysphagia (Difficulty Swallowing), Cleveland Clinic, https://my.clevelandclinic.org/health/symptoms/21195-dysphagia-difficulty-swallowing (last visited Feb. 14, 2022); see also JSR, PageID # 239 (discussing choking risks).

On February 22, 2019, Lennan issued Petit a fourth EWN, this time for leaving an open soft drink in the refrigerator without a name or date. (Def. SMF, PageID # 467; Pl. Response SMF, PageID # 491; JSR, PageID #s 119–20.) Petit proclaimed upon receipt of this fourth EWN that she did not care. (Pl. Response SMF, PageID # 503; Def. Reply SMF, PageID # 551.)

### 2. The Follow-Up and Fallout of the Petit EWNs

Following the January 18, 2019 EWN, Petit made a complaint to Gagnon about Lennan.[6] For her part, Lennan also approached Gagnon following the January 18th incident to alert her that it was a "serious issue" because of the risks involved in giving residents foods that did not meet their individual texture modifications. (JSR, PageID # 263.) Gagnon called Goscinski and asked her to follow up on Petit's complaint. (Def. SMF, PageID # 462; Pl. Response SMF, PageID # 489; JSR, PageID # 382.) On January 31, 2019, at Goscinski's request, Lennan provided Goscinski a written narrative of the January 18th incident.[7] (Def. SMF, PageID # 463; Pl. Response SMF, PageID # 489; JSR, PageID # 179.) As part of her follow up, Goscinski also received written statements from two Genesis employees, Victoria Cash and Miriam Haley, who had had witnessed the third-floor interactions between Lennan and Petit on January 18th.[8] (Goscinski Aff. (ECF No. 29-1), PageID # 474; JSR, PageID #s 174–75.)

On January 31, 2019, Goscinski and Chlosta visited Springbrook. (JSR, PageID #s 183, 356.) In a follow-up email to both following the visit, Gagnon acknowledged that the visit

---

[6] Gagnon ultimately received multiple complaints from Petit regarding her working relationship with Lennan, but could not recall when Petit's complaints began. See JSR, PageID #s 350–51. According to Goscinski, Petit's complaints about Lennan began after Lennan disciplined Petit. Id., PageID # 387.

[7] This was not the first time Lennan had discussed Petit with Goscinski. At some point after Goscinski became District Manager in late 2018, Lennan and Goscinski discussed Petit's inattentiveness to meal tickets. JSR, PageID # 384.

[8] The Court notes that the written statements of Cash and Haley would be hearsay if considered for the truth of the matters asserted, but the Court considers them only as items received by Goscinski as part of her follow-up on the 1/18/19 incident. See United States v. DeCologero, 530 F.3d 36, 58 (1st Cir. 2008) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." (cleaned up) (quoting F.R.E. 801(c) advisory committee's note)).

"surrounded concerns regarding [Lennan], more specifically, the incident which involved her interaction with one of her employees which department managers witnessed and were very concerned with." (Id., PageID # 183.)  Goscinski also received a follow-up email from Haley on February 4, 2019, in which Haley relayed concerns about a report she had received from her assistant.  (Id., PageID #s 180–82.)  Specifically, Haley explained to Goscinski that it appeared Lennan was "trying to involve more people" in her ongoing issues with Petit.  (Id., PageID # 180.)

On February 8, 2019, Lennan forwarded to Goscinski and Chlosta a written complaint, dated February 7, 2019, which she had received from Melissa Gray, a Genesis clinical nursing assistant.[9]  (Id., PageID #s 122–23.)  Gray offered an unflattering assessment of Petit, calling her "incompetent, negligent, and slow," as well as "argumentative."  (Id.)  She indicated that Petit "continuously serves wrong consistency, potentially going against doctor ordered fare," and also that Petit's behavior was "negatively affecting the quality and safety of the food" fed to Springbrook's residents.  (Id.)  Gray wrote this email after she complained to Lennan verbally and Lennan asked her to put her concerns in writing.  (Id., PageID # 266.)  In forwarding Gray's email, Lennan referenced how the email was similar to verbal complaints she "often" received about Petit and mentioned that she had raised these complaints about Petit in an earlier meeting with Goscinski and Chlosta. (Id., PageID # 122.)   Despite recognizing Gray's allegations as serious, neither Goscinski nor Chlosta spoke to Lennan regarding the allegations in the Gray complaint letter, nor did they forward Gray's complaints on to Gagnon.  (Pl. Response SMF, PageID # 502; Def. Reply SMF, PageID # 550; JSR, PageID #s 349, 386–87.)

Also on February 8, 2019, Gagnon wrote to Chlosta to ask that HCSG send another account manager to Springbrook.  (JSR, PageID # 183.)  She explained that "[w]hile ultimately having

_____

[9] In the closing lines of Gray's email, she indicated that she would like her complaint letter to "remain private," but also offered her phone number indicating she was "happy to expand" on her complaints.  JSR, PageID # 123.

[Lennan] exit the building would be best for the building, it [was] certainly not due to lack of work." (Id.)  Rather, Gagnon cited ongoing complaints from Petit, including a new complaint that Lennan was not helping Petit view her paycheck.  (Def. SMF, PageID # 465; Pl. Response SMF, PageID # 490; JSR, PageID # 183.)

Not long after, Petit called Goscinski and complained that "things had gotten worse" between her and Lennan.  (JSR, PageID # 186.)  On February 19, 2019, Goscinski and Gagnon spoke by phone.  (Id., PageID # 197.)  In a follow-up email, Gagnon, exercising her authority as Springbrook's Executive Director, requested that Lennan be removed from Springbrook and "transferred to a different building." (Id.)  Goscinski forwarded this request to Chlosta.  (Id.)  At around the same time, Goscinski received a previously requested handwritten statement from Petit detailing her complaints about Lennan.  (Id., PageID #s 198–200, 388.)

On February 21, 2019, Gagnon forwarded to Goscinski the three EWNs that Lennan had thus far given Petit.  (Id., PageID # 201.)  Gagnon wrote that some of the write-ups were for issues that "should be addressed with all kitchen staff, not just this one employee who has a concern with her manager." (Id.)  Gagnon asked Goscinski to let her know "the status . . . on moving [Lennan] out of [the] building," suggesting that a "plan" was needed "because clearly this [was] becoming a much larger issue." (Id.)

### D.  Lennan's Suspension & Termination

On February 28, 2019, HCSG suspended Lennan.  (JSR, PageID # 213.)  Lennan learned of her suspension during a meeting that day with Goscinski and Gagnon.  (JSR, PageID #s 213–14, 390.)  However, HCSG's decision was made by Chlosta, Goscinski, and Chris Ricci, a HCSG human resources representative.  (Id., PageID # 390.)  It was explained to Lennan at the time that

the decision to suspend her was related to complaints that she yelled at staff.[10]  (Id., PageID #s 213–14, 351, 385.)  At the meeting, Goscinski told Lennan that there would be an investigation, and she asked Lennan to submit a statement.[11]  (Pl. Response SMF, PageID # 504; Def. Reply SMF, PageID # 552.)  On March 3, 2019, Lennan submitted her response statement, in which she disputed an allegation that she was heard yelling and swearing at her employees so loudly that it could be heard in the front office of the building.  (JSR, PageID #s 213–14.)

On March 5, 2019, HCSG terminated Lennan's employment.  (Stip., PageID # 107.)  On that day, Lennan met with Chlosta and Goscinski.  (Pl. Response SMF, PageID # 504; Def. Reply SMF, PageID # 553.)  During the meeting, Lennan asked if they had come to any conclusions in their investigation, and they replied that no conclusions had been reached.  (Id.)  Chlosta then provided Lennan a termination letter, along with an email exchange between Gagnon and Goscinski in which Gagnon had requested Lennan's removal from Springbrook.  (Id.)  He then wished Lennan good luck.  (Id.)  HCSG's termination letter provided the following explanation for Lennan's termination:

> Over the past 60 days HCSG has received employee concerns/complaints as well as concerns from our client regarding your ability demonstrated to function as the foodservice manager.  Ultimately our client has requested a change and has asked for a replacement in regards to our foodservice manager at this location. Due to the above mentioned concerns HCSG is terminating your employment as of this date.

(JSR, PageID # 125.)

---

[10] According to Chlosta, however, Lennan was suspended for the way she was treating Petit.  JSR, PageID # 316.

[11] The timing and extent of any investigation that took place between 2/28/19 and 3/5/19 is genuinely disputed.  See JSR, PageID #s 215–16, 272, Goscinski Aff. (ECF No. 29-1), PageID #s 475–76, Bartlett Aff. (ECF No. 30), PageID # 479; see also Def. SMF, PageID #s 468–69; Pl. Response SMF, PageID #s 491–92.

While this written explanation suggested that Genesis, presumably through Gagnon, had asked for Lennan to be removed from Springbrook, HCSG did not offer Lennan an alternative position with HCSG.[12]

### E. Procedural History

In November 2019, Lennan filed a complaint in Cumberland County Superior Court, asserting a single claim of retaliation in violation of the Maine Whistleblowers' Protection Act. (Compl. (ECF No. 3-2), PageID #s 12–15.)  HCSG removed the matter to this Court in February 2020.  (Notice of Removal (ECF No. 1), PageID #s 1–5.)  Following discovery, HCSG filed the present Motion.  (Mot. (ECF No. 28), PageID #s 433–53.)

## III.   DISCUSSION

Plaintiff claims that Defendant violated the Maine Whistleblowers' Protection Act ("WPA"), 26 M.R.S.A. §§ 831 *et seq.*, by suspending and then terminating her for reporting conduct that posed a risk to the safety of Springbrook's residents.

### A. The WPA

The WPA prohibits retaliation by an employer against an employee who makes a good-faith report of what the employee has reasonable cause to believe is "a condition or practice that would put at risk the health or safety of that employee or any other individual."[13]  26 M.R.S.A. § 833(1)(B).   "Maine law confers a private right of action for a

---

[12] Importantly, HCSG admits for present purposes that no such offer was made.  Pl. Response SMF, PageID # 504; Def. Reply SMF, PageID # 553.  However, both Chlosta and Goscinski testified that Chlosta offered Lennan the opportunity to return to a traveling manager position.  JSR, PageID #s 317, 391.  Chlosta further testified that only upon Lennan's rejection of this offer did he proceed to present her with a termination letter, and "[t]he termination was only because she didn't want to take the position that [he] offered her elsewhere."  Id., PageID # 317.  Likewise, Goscinski stated, "Lisa had chosen not to be a traveling manager at that time, so she left the company's employ[.]"  Id., PageID # 391.

[13] The Court notes that Plaintiff additionally invokes 26 M.R.S.A. § 833(1)(E), which concerns reports of acts or omissions "deviat[ing] from the applicable standard of care for a patient by an employer charged with the care of that patient."  See Pl. Response (ECF No. 32), PageID #s 518–19.  Because the Court already concludes a jury could reasonably find that Plaintiff engaged in protected activity under § 833(1)(B), the Court does not address whether

violation of this statutory imperative." Theriault v. Genesis Healthcare LLC, 890 F.3d 342, 349 (1st Cir. 2018). To make out a WPA claim, an employee must establish that: "(1) she engaged in protected activity; (2) she suffered a materially adverse action or was adversely affected, and (3) there was a causal connection between the protected activity and the adverse action." Benson v. Wal-Mart Stores E., L.P, 14 F.4th 13, 30 (1st Cir. 2021) (citing Brady v. Cumberland Cnty., 126 A.3d 1145, 1150–51 (Me. 2015)). Here, because neither party disputes that Plaintiff's suspension and ultimate termination constituted adverse employment actions, only the first and third elements are at issue.

When reviewing WPA claims at the summary judgment stage, the Law Court has developed a "Maine-specific retaliation paradigm." [14] Theriault, 890 F.3d 342, 351 (discussing Brady). Under this paradigm, the Court asks "whether the record as a whole would allow a jury to reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent." Brady, 126 A.3d at 1158 (Me. 2015) (emphasis added). To answer this question, the Court must, "in a seamless inquiry, recognize any evidence that the employer had a lawful reason for the adverse action taken against the employee, and any evidence that the proffered reason is merely a pretext." Theriault, 890 F.3d at 350.

---

§ 833(1)(E) is also a viable avenue. See Cormier v. Genesis Healthcare LLC, 129 A.3d 944, 949–50 (Me. 2015) ("[B]ecause the evidence would allow a reasonable jury to find that [the plaintiff's] complaints were protected pursuant to section 833(1)(B), she has met her burden of production on the issue of protected activity, irrespective of whether her complaints are also protected pursuant to section 833(1)(E).")

[14] The Court notes the parties' disagreement over how their burdens under the Brady paradigm compare to what had previously been required under the familiar McDonnell Douglas burden-shifting framework. See, e.g., Pl. Response, PageID # 527 n.7; Def. Reply (ECF No. 33), PageID #s 530–31. To be clear, "the Law Court did not regard [Brady] as a sea change in the law." Theriault, 890 F.3d at 350. "Brady's new approach simply means that, at summary judgment, 'the parties are entitled to present evidence of the reasons for the employer's action, but without any need to follow the McDonnell Douglas burden-shifting structure.'" Id. at 351 (quoting Brady, 129 A.3d at 1158).
　　　For related reasons, the Court declines to pass on Defendant's argument that, under the Erie Doctrine, the Court should not apply Brady at all, on the basis that it is a procedural rule binding only in state court proceedings. See Def. Reply, PageID #s 530–31. The Court's conclusion today would be the same under either Brady or McDonnell Douglas, because the sequencing of burdens does not make a functional difference on this record.

Before turning to this ultimate question, the Court first considers Defendant's argument that Plaintiff did not engage in protected activity under the WPA.

### B.  Protected Activity

The WPA "is not triggered by every complaint that relates to safety." Cormier v. Genesis Healthcare LLC, 129 A.3d 944, 948–49 (Me. 2015).  Rather, the WPA applies where an employee, "*acting in good faith*, . . . *reports* to the employer or a public body, orally or in writing, what the employee has *reasonable cause* to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual." 26 M.R.S.A. § 833(1)(B) (emphasis added). "[A] 'report' under the WPA is one that would bring the safety issue to the employer's attention or is made to shed light on and in opposition to a safety-related concern." Pushard v. Riverview Psychiatric Ctr., 224 A.3d 1239, 1244 (Me. 2020) (cleaned up).  "A complaint is made in good faith if the employee's motivation is to stop a dangerous condition." Cormier, 129 A.3d at 949. "[W]hen the employee has a subjective and objectively reasonable belief that a dangerous condition or practice exists," the report is supported by reasonable cause.  Id.

Here, Plaintiff asserts that the following actions were protected activity:  (1) her January 31st written response to Petit's complaint; (2) her February 8th forwarding of Gray's complaint; and (3) the four EWNs.[15]  (Pl. Response, PageID #s 519–20.)

### 1.  January 31st Written Response

Defendant argues that Plaintiff did not engage in protected activity when she submitted the January 31st written response because (1) the response was specifically requested by Goscinski,

---

[15] Plaintiff additionally cites as protected activity a pair of conversations with her supervisors that she alleges occurred in October 2018 and February 2019, respectively.  Pl. Response, PageID #s 519–20.  As relevant here, Defendant has made sham affidavit objections as to the admission of both conversations.  See Pl. Response SMF, PageID #s 497, 500; Def. Reply SMF, PageID #s 539–40, 543–44.  Because these additional instances are unnecessary to the Court's conclusion, regardless of their admissibility, the Court does not evaluate them for present purposes.  Similarly, the Court for present purposes puts aside Plaintiff's apparent further assertion that "[o]n January 29th Lennan reported Petit's mistake to Goscinski," which is not supported by the current record.  Pl. Response, PageID # 520.

and (2) it was merely an attempt to justify her own conduct following Petit's complaint.  (Mot., PageID #s 440–42.)  Defendant asserts that Plaintiff did not act with the requisite good-faith whistleblower intent, characterizing her actions instead as the mere "fulfillment of her job duties" and a "preemptive effort to avoid repercussions for her [own] unprofessional behavior."  (Id., PageID #s 440–41.)

The Court finds the question of whether the January 31st written response constituted protected activity to be trialworthy.  Even if Defendant is correct that Plaintiff was required to submit this document as part of her job duties, this would still not result in a shortcut to summary judgment.  "[A]lthough a particular employee's job duties may be relevant in discerning his or her actual motivation in reporting information, those duties are not dispositive of the question."  Harrison v. Granite Bay Care, Inc., 811 F.3d 36, 51 (1st Cir. 2016).  Rather, "the critical point when analyzing whether a plaintiff has made out the first element of a [WPA] claim—engaging in activity protected by the Act—is an employee's motivation in making a particular report or complaint."  Id.[16]

Here, Plaintiff indeed may have submitted the response as part of her job duties.  She may have also been acting self-servingly.  However, she may have also been seeking "at least in part" to expose an unknown or concealed safety issue, Currie v. Industrial Sec., Inc., 915 A.2d 400, 407 (Me. 2007), and "different things may be true simultaneously," Ako-Annan v. E. Me. Med. Ctr., No. 1:19-cv-00544-JAW, 2021 WL 3719240, at *42 (D. Me. Aug. 20, 2021) ("[Defendant] cited no authority for the proposition that a self-interested whistleblower cannot invoke the []WPA's

---

[16] The Court notes Defendant's reliance on Capalbo v. Kris-Way Truck Leasing, Inc., 821 F. Supp. 2d 397 (D. Me. 2011), for the proposition that "[n]o reasonable trier of fact could conclude that the reports described by [plaintiff], which [defendant] required of him, constituted conduct in opposition to an unlawful employment practice of [defendant]."  Mot., PageID # 440.  However, Capalbo was decided five years before Harrison clarified the law, and the opinion explicitly noted a contemporary absence of binding authority.  See Capalbo, 821 F. Supp. 2d at 419.

protections.  The Court found none.").  A jury could reasonably conclude, for instance, that Lennan's roughly contemporaneous report to Gagnon that the January 18th incident posed a serious risk to the residents' health suggests that her report to Goscinski, too, was motivated at least in part by such considerations.  While it is possible that a jury would agree with Defendant that Plaintiff's other potential motivations crowded out any good-faith intent to blow the whistle, a mere possibility "provide[s] no basis for . . . summary judgment."  Pippin v. Boulevard Motel Corp., 835 F.3d 180, 186 (1st Cir. 2016).

### 2.  February 8th Forwarding of Gray's Complaint

As to Plaintiff's February 8th forwarding of Gray's complaint, Defendant asserts that *Gray* did not have the requisite intent when she composed the complaint.  (See Mot., PageID # 442 ("Gray's complaint was motivated by her perception of Petit's 'attitude' and 'smart mouth,' but was not motivated by any purported 'imperfection' by Petit.").)  Defendant then argues that, by extension, Plaintiff also could not be attributed whistleblowing intent, nor was such intent reflected in her transmission email.  (Id.)

To be clear, Lennan—not Gray—is our Plaintiff, and she conveyed a complaint to her superiors alleging dangerous inconsistencies in the service of food to a vulnerable patient population.  A reasonable jury could conclude that Plaintiff's motivation in doing so was patient safety.  The Court does not view it to be material if Gray's motivation was not.[17]

### 3.  The EWNs

Because the Court has already found at least two trialworthy instances of potential protected activity, the Court need not consider whether the EWNs themselves constituted protected

---

[17] Defendant appears to cite Cormier, 129 A.3d at 949, for the proposition that Gray's intent in drafting her complaint should control the Court's consideration of Plaintiff's intent in forwarding the complaint.  The Court has reviewed Cormier but does not find support for this unintuitive assertion, nor has the Court found support elsewhere.

activity. However, the Court notes that, on the current record, Plaintiff would likely have difficulty establishing that any of the EWNs were "reports" under the WPA, given the lack of indication in the record that Plaintiff submitted the EWNs to Defendant[18] or otherwise anticipated that they would be reviewed.

### C. Causation

"An employee's protected activity is causally connected to the adverse employment action when the alleged retaliation was a substantial, even though perhaps not the only, factor motivating the adverse employment action." Johnson v. York Hosp., 222 A.3d 624, 631 (Me. 2019) (cleaned up). "Any relevant evidence, including temporal proximity, may be considered in determining whether there is an arguable causal nexus." Id.

Plaintiff asserts that a trier of fact could reasonably conclude that her protected activities were causally related to her suspension and termination. (Pl. Response, PageID # 525.) Plaintiff points to factors including the close temporal proximity of the events, the impact of Chlosta's contradictory testimony, and Defendant's decision to terminate Plaintiff without following the steps established in the progressive discipline policy. (Id., PageID #s 525–26.)

Defendant disagrees, arguing that Plaintiff cannot establish causation because Gagnon, a Genesis employee, insisted on Plaintiff's removal from Springbrook. (Mot., PageID #s 446–49.) Defendant additionally asserts a number of other legitimate, non-retaliatory reasons for terminating Plaintiff, including but not limited to (1) the October 2018 sandwich incident; (2) Plaintiff's resistance to the daily labor budget; (3) the kitchen's performance on internal reports

---

[18] Indeed, the Court notes that Plaintiff specifically denied providing the 1/18/19 EWN to Goscinski, even as Defendant seemed prepared to concede the point. See Def. SMF, PageID # 462; Pl. Response SMF, PageID # 489. Notably, the summary judgment record does establish that Gagnon provided at least the first three EWNs to Goscinski on 2/21/19.

and audits; (4) the alleged yelling incident; and (5) statements Goscinski allegedly received during an investigation.  (Id., PageID #s 449–51.)

On the current record, the Court concludes that causation is also a trialworthy issue.  First, the undisputed record establishes close temporal proximity between Lennan's protected activity and her termination.  As Defendant correctly points out, temporal proximity alone cannot create a trialworthy issue on causation when an employer proffers legitimate, non-retaliatory reasons for its termination decision.  (See Def. Reply, PageID # 532.)  However, temporal proximity, when combined with evidence that an employer's asserted reasons for a termination are pretextual, can suffice to create a trialworthy issue on causation.  See Theriault, 890 F.3d at 352 (explaining temporal proximity "is not sufficient, by itself, to forge a causal link strong enough to create an inference of causation and thus satisfy Brady's new, Maine-specific retaliation paradigm in the face of an employer's asserted legitimate non-retaliatory reason for the adverse employment action"); Pushard, 224 A.3d at 1246 (finding causation was not established on a record that consisted only of temporal proximity in the absence of pretext).  Here, a reasonable jury could find Defendant's asserted non-retaliatory reasons to be pretextual.

"A plaintiff may show pretext by establishing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' for the challenged employment action."  Theriault, 890 F.3d at 353 (quoting Cookson v. Brewer Sch. Dep't, 974 A.2d 276, 282 (Me. 2009)).  First, the Court notes that while Gagnon's requests for Plaintiff's departure may provide a legitimate reason for Plaintiff's removal *from Springbrook*, they do not account for her termination from HCSG altogether.  Indeed, at least one of Gagnon's emails suggested that she only wished for Plaintiff to be "transferred to a different building" (JSR,

PageID # 197), and, in any event, the record does not establish that Gagnon, as Springbrook's director, had the authority to direct Plaintiff's outright termination.[19]

Second, the Court notes that Chlosta and Goscinski both testified that they terminated Plaintiff only because she would not accept their transfer offer.  (See Id., PageID #s 317, 391.) This testimony contradicts Defendant's present explanations for the firing.  Furthermore, Defendant admits for present purposes that such an offer was not even made, adding a further layer of inconsistency.   In light of these discrepancies, a reasonable jury could find Defendant's credibility lacking and its proffered reasons pretextual.  See Murray v. Kindred Nursing Ctrs. W. LLC, 789 F.3d 20, 27 (1st Cir. 2015) (pretext can be established upon a showing of "either knowing falsity or bad faith").[20]

Third, as to the progressive discipline policy, the Court notes Defendant's assertion, ultimately rooted in the language of the Employee Handbook, that it was not required to apply the policy "in all circumstances."  (See Def. Reply, PageID # 533; Def. Reply SMF, PageID #s 551–52.)  However, even if the policy was not mandatory, "[e]vidence that the employer deviated from its standard procedure or policies in taking an adverse employment action against a plaintiff may be relevant to the pretext inquiry."  Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 50 (1st Cir. 2019) (collecting cases).  "The rationale is that if an employer has a policy or procedure that governs a specific situation but fails to adhere to the same in taking an adverse employment action against an employee, then it might be inferred that the reason articulated for taking the adverse

---

[19] In its Reply, Defendant contends that it terminated Plaintiff "because Genesis, HCSG's client, demanded Plaintiff's removal from Springbrook on no less than five occasions, as was its contractual right, before HCSG acquiesced to Genesis' request."  Def. Reply (ECF No. 33), PageID # 530.  The Court notes that this contract is not in the record and, thus, the Court cannot confirm this assertion.

[20] The Court further notes that Chlosta, in his testimony, directly linked Plaintiff's suspension to her treatment of Petit, which is also inconsistent with Defendant's current explanations.  JSR, PageID # 316.  Additionally, insofar as Defendant presently cites incidents from late-2018, this is inconsistent with the termination letter, which linked Plaintiff's termination to events within "the past 60 days."  Id., PageID # 125.

employment action against the employee was not true." Id.  Here, Defendant has not explained its decision not to apply the policy when disciplining Plaintiff, nor has it claimed that such a deviation was common.  By the very language of the Handbook, for instance, EWNs would "generally" be used, suggesting their issuance would occur in the majority of cases.  (Def. Ex. A, PageID # 567.) Defendant's deviation without explanation from the progressive discipline policy, when considered alongside the previously noted inconsistencies, could lead a reasonable factfinder to conclude that Defendant's asserted non-retaliatory reasons are pretextual.

As the Law Court has cautioned, "when judges evaluate a summary judgment record, they should be mindful that what might initially appear to be a weak case of pretext is not the same as no case.  Proof produced by the employee should be evaluated with an awareness that reasonable jurors can and often do disagree as to both the weight and meaning of evidence." Trott v. H.D. Goodall Hosp., 66 A.3d 7, 14–15 (Me. 2013).  Here, the question of pretext will require a factfinder to weigh the credibility of multiple witnesses, who have offered differing explanations for Lennan's termination.  It is possible that a factfinder could conclude that HCSG simply made a poor decision in firing Lennan, which would not be actionable.  See Pushard, 224 A.3d at 1245 ("[E]vidence of a decisionmaker's mistaken judgment is not dispositive of the question of pretext unless that evidence would permit the factfinder to conclude that the stated nondiscriminatory justification for the adverse employment action was either knowingly false or made in bad faith." (quoting Murray, 789 F.3d at 27)).  However, on the record presented, a factfinder might also conclude that Lennan's termination was motivated at least in part by an intent to retaliate against her for attempting to address and report safety concerns surrounding Springbrook's food service

operations.[21]  Given this potential, the Court readily finds Plaintiff's claim cannot be resolved on summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 28) is DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 17th day of February, 2022.

---

[21] Although not argued by the parties, the Court notes that the record may also support a "cat's paw" theory of retaliation.  See, e.g., Brandt v. Fitzpatrick, 957 F.3d 67, 79 (1st Cir. 2020) (Under this theory, "an employer can be held liable when a decision-making official . . . relies on false information that is manipulated by another employee who harbors illegitimate animus to take an adverse employment action." (cleaned up)).  Specifically, even if HCSG's decisionmakers were not substantially motivated by retaliatory animus when they terminated Plaintiff, she might nonetheless establish that HCSG relied on information that was manipulated by others who harbored retaliatory animus towards her following her reported safety concerns.  See, e.g., McLean v. Delhaize Am. Distribution, LLC, No. 2:18-cv-00152-GZS, 2019 WL 4046546, at *7 (D. Me. Aug. 27, 2019) (denying summary judgment in an employment case based on trialworthy evidence establishing a "cat's paw" theory of retaliation).